**IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE: ) | Case No. 09-02083-jw |
| ) | Chapter 11 |
| **INLET RETAIL ASSOCIATES, LLC,** ) | |
| ) | |
| **Debtor.** ) | |

**DISCLOSURE STATEMENT**

1. **INTRODUCTION.**

This Disclosure Statement is proposed by the Debtor in connection with the solicitation of votes for the Plan of Reorganization submitted by the Debtor (the "Plan").

The purpose of this Disclosure Statement is to provide adequate information to enable creditors of the Debtor and other applicable parties in interest to make an informed judgment with respect to voting to accept or reject the Plan. The Disclosure Statement should be read together with the Plan which is incorporated herein by reference. Creditors and other parties in interest may wish to consult with their own counsel or other advisors with respect to the contents of this instrument.

2. **DEFINITIONS.**

All of the definitions contained in the Plan are incorporated herein by reference. Please review the Definitions in the Plan when considering the Disclosure Statement, as many of the terms used here have specific meanings.

3. **CONDITIONS TO CONFIRMATION UNDER THE BANKRUPTCY CODE.**

In order to confirm the Plan, the Code requires that the Bankruptcy Court make a series of determinations concerning the Plan, including that (i) the Plan has classified creditor and other interests in a permissible manner; (ii) the contents to the Plan comply with the technical requirements of Chapter 11 of the Code; (iii) the Debtor has proposed the Plan in good faith, and (iv) the Debtor's disclosures concerning the Plan have been adequate, and have included information concerning all payments made or promised in connection with the Plan and the Chapter 11 proceeding.

The Code also requires that: (i) the Plan be accepted by the requisite vote of holders of claims and interests, (ii) the Plan be feasible, and (iii) the confirmation of the Plan be in the "best interests" of all creditors and other parties in interest. To confirm the Plan, the Bankruptcy Court must find that all three conditions are met. Thus, even if creditors of the Debtor and other applicable parties in interest accept the Plan by the requisite vote, the Bankruptcy Court must make independent findings with respect to the Plan's feasibility, and whether it is in the "best interests" of the parties in interest.

If the Plan is not accepted and confirmed, an alternate plan submitted by the Debtor or by another party in interest may be accepted by creditors and other parties in interest and confirmed by the Bankruptcy Court, or the Debtor may be liquidated pursuant to Chapter 7 of the Code and the net proceeds of such liquidation would be distributed generally in the following order: creditors with claims for domestic support obligations (not applicable in this case), administration creditors, priority creditors, unsecured creditors, and equity holders.

**Classification of Claims and Interests.**

The Bankruptcy Court requires that a plan of reorganization place each creditor's claim and (as applicable) each member's, partner's or shareholder's interest in a class with other claims or interests which are "substantially similar." The dollar amount of a claim usually is not the basis upon which to distinguish it from other claims. However, an exception to the general rule is permitted in a case of a separate class of claims consisting of only unsecured claims, each of which is less than an amount that the Bankruptcy Court

approves as reasonable and necessary for administrative convenience.

**Best Interests of Unsecured Creditors.**
The Bankruptcy Court must independently determine that the Plan is in the best interests of all classes of creditors.  "Best interests" means that the Plan provides to each member of each impaired class of claims and interests a recovery which has a present value at least equal to the present value of the distribution which each such person would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.  The Debtor believes that the Plan is in the best interests of all parties in interest.

To calculate what members of each impaired class of unsecured claims and interests would receive if the Debtor were liquidated, the Bankruptcy Court must first determine the dollar amount that would be generated from the liquidation.  After determining this amount, the Bankruptcy Court must subtract therefrom:  (i) the costs of liquidation (including trustee's fees, the fees of counsel and other professionals employed by the trustee and selling expenses); (ii) unpaid expenses incurred by the Debtor during its reorganization proceeding (such as fees for attorneys, accountants and other professionals); and (iii) claims arising by reason of the trustee's rejection of obligations incurred by the Debtor during reorganization.  These costs and expenses, such other claims as might arise during liquidation, and secured claims which may attach to liquidation proceeds are paid in full out of the liquidation proceeds before the balance is distributed to holders of unsecured claims.

**Acceptance.**
The Code requires as a condition to confirmation that each impaired class of claims or interests accept the Plan, with the exception described in the following Section.  The Code defines acceptance of the plan of reorganization by a class of claims as acceptance by two-thirds (2/3) in dollar amount and majority in the number of claims of that class, but for that purpose counts only those claims who _actually vote_ to accept or reject the Plan.  The Code defines acceptance of a plan by a class of interests (i.e., equity securities) as acceptance by two-thirds (2/3) of the number of shares, but for that purpose counts only shares _actually voted_.  Holders of claims or interests who fail to vote are not counted as either accepting or rejecting the Plan.

Classes of claims or interests that are not "impaired" under the Plan are deemed to have accepted the Plan.  Thus, the Debtor is soliciting acceptances of the Plan from those classes of creditors which hold claims or interests which are impaired.  A class generally is "impaired" if the legal, equitable, and contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults, by reinstating maturities or by payment in full in cash.

**Confirmation Without Acceptance by all Impaired Classes.**
The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it.  These "cram-down" provisions for confirmation of a plan despite the non-acceptance of one or more impaired classes of claims or interests are set forth in § 1129(b) of the Bankruptcy Code.

If a class of secured claims rejects the Plan it may still be confirmed so long as the Plan meets one of several different tests including:  (i) that the Plan provides that each holder included in the class retains its liens securing such claims, whether the property subject to such claims is retained by the Debtor or transferred to another entity, to the extent of the allowed amount of such claims, and each holder receives on account of its claim deferred cash payments totaling the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the Debtor's interest in such property; or (ii) that the Plan provides each holder included in the class with the realization of the indubitable value of the claim.

If an impaired class of unsecured claims rejects the Plan, it may still be confirmed so long as the Plan provides that:  (i) each holder of a claim included in the rejecting class receives or retains on account of that claim property which has a value, as of the effective date of the Plan, equal to the allowed amount of such claim, or (ii) the holder of any claims or interest that is junior to the claim of such class will not receive or retain on account of such junior claim or interest any property at all.

If an impaired class of interests rejects the Plan, it may still be confirmed so long as the Plan provides that: (i) each holder of an interest of such Class receive or retain on account of such interest property of a value, as of the effective date of the Plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (ii) the holder of any interest that is junior to the interest of such Class will not receive or retain any property under the Plan on account of such junior interest.

The Plan of Reorganization represents a legally binding arrangement and must be read in its entirety. Creditors should not rely solely on the summary contained in this Disclosure Statement in determining its rights under the Plan. Bankruptcy Court approval of the Disclosure Statement does not constitute approval by the Bankruptcy Court on the merits of the Plan.

4.  **BACKGROUND.**

The Debtor, Inlet Retail Associates, LLC ("IRA") was formed in 2005 as a South Carolina limited liability company. Its sole purpose is to own and manage a certain retail shopping center located in Murrells Inlet, South Carolina (the "Property"). IRA is owned by a single class of members, notably:

| | |
|---|---|
| ***Charles E. Fancher, Jr.*** | 10% Percentage Interest |
| | 25% Residual Percentage Interest |
| ***Nathan P. Fishkin*** | 10% Percentage Interest |
| | 25% Residual Percentage Interest |
| ***Westminster Inlet, LLC*** | 80% Percentage Interest |
| | 50% Residual Percentage Interest |

The Property is operated and generally known as the "Inlet Square Mall" (the "Mall"). The area of the Mall consists of 49.763 acres, more of less, of land with buildings and improvements (the "Mall Tract"), together with 0.080 acres, more or less, of land with signage improvements (the "Sign Tract"). The two tracts are contiguous to one another and are located off Highway 17 Bypass in Murrells Inlet, in Horry County, South Carolina. IRA does not possess fee ownership of the Property (although it was conveyed title to the improvements thereon by Deed of SC Fund VI Properties, LLC (recorded October 11, 2005 in Book 2992, page 961, Horry County Register of Deeds Office), and instead possesses a leasehold interest in the Property pursuant to several major leases.

### *LEASE HISTORY:*

The history of the leases is long and may be confusing, and consists of multiple parts, but because many of the parties are still involved with the Mall, it is presented as follows (all recording references are to the Horry County Register of Deeds Office):

### *IN RE: THE GROUND LEASES*

I.  SING LEASE

1.  The Sing Lease Agreement among Charlie Sing, Carrie W. Sing and Charlie James Sing, Lessor, and Kenneth D. Anderson, Lessee, recorded August 23, 1983, Deed Book 815 at page 249.

2.  Assignment of Lease from Kenneth D. Anderson, Assignor, to Gerald A. Tadlock, Assignee, dated January 15, 1987, recorded January 16, 1987, Deed Book 1109 at page 738.

3.  Carrie W. Sing died on March 10, 1985, and her interest in the Sing Lease Agreement was devised to Charlie Sing and Charlie James Sing.

4.  Amendment of Lease Agreement dated September 15, 1987, recorded October 30, 1987 in Deed

Book 1173 at page 341, amending the term and monthly rent amount.

5.   Second Amendment to Lease dated October 31, 2006 recorded November 20th, 2006 in Deed Book 3192 at page 27, providing an option to extend the term in favor of the Lessee term and modifying the monthly rent amount.

6.   Gerald A. Tadlock died in May 16, 2007, Probate Court for Georgetown County, SC, File No. 2007ES22-00208.

7.   Deed of Distribution from Tadlock Estate to Gaynell O. Tadlock, as Trustee of the Gerald A. Tadlock QTIP Trust u/w of Gerald A. Tadlock dated August 23, 2006, recorded in Deed Book 3267 at page 1709.

8.   Assignment of the Sing Lease leasehold interest by Gaynell O. Tadlock, as Trustee of the Gerald A. Tadlock QTIP Trust u/w of Gerald A. Tadlock to **West C Street Holdings, LLC** by Assignment of Leasehold Interest dated August 13, 2007, recorded in Book 3268 at page 2561.

II.   JORDAN LEASE

1.   The Jordan Lease Agreement among Jim T. Jordan, Dorothy Mason Jordan, Marian J. Thomson, Connie J. Koloditch and Steven T. Jordan, Lessor, and Tad's Land Development Company, Inc., Lessee, dated January 27, 1983 and recorded in Deed Book 793 at page 776.

2.   First Amendment to Lease Agreement dated July 8, 1987, and recorded August 6, 1987, in Deed Book 1153 at Page 201.

3.   Unrecorded Agreement to Extend Lease dated November 9, 2006, providing for an option to extend the term in favor of the Lessee and modifying the rent amount.

4.   Assignment from Tad's Land and Development Company, Inc. to **West C Street Holdings, LLC** dated December 27, 2007 and recorded December 28, 2007 in Deed Book 3304 at page 652.

III.   MALL LEASE

1.   Sublease by Tad's Land Development Company, Inc. and Gerald A. Tadlock to Coastal Limited Partnership, a South Carolina limited partnership, dated January 21, 1988, a Memorandum of which was recorded in Deed Book 1193 at page 250, amended by a Ground Lease Modification Agreement No. 1 dated as of November 4, 1988, in connection with which a First Amended Memorandum of Lease dated November 4, 1988 was recorded November 18, 1988 in Deed Book 1266 at page 695

2.   Modified by (i) Landlord's Non-Disturbance Agreement among Jim T. Jordan, Dorothy Mason Jordan, Marian J. Thomson, Connie J. Koloditch and Steven T. Jordan, as Fee Owner, Tad's Land and Development Company, Inc. as Groundlessee and Coastal Limited Partnership, a South Carolina limited partnership, as Sublessee, dated September 18, 1987 and recorded January 21, 1988 in Deed Book 1193 at page 286) ; (ii) Estoppel and Clarification of Landlord's Non-Disturbance Agreement dated April 26, 1990 by and between Jim T. Jordan, Dorothy Mason Jordan, Marian J. Thomson, Connie J. Koloditch, Steven T. Jordan, Gerald A. Tadlock, Tad's Land and Development Company, Inc., and Coastal Limited Partnership recorded May 21, 1990 in Deed Book 1393 at page 512 ; (iii) Estoppel Certificate and Second Clarification of Landlord's Non-Disturbance Agreement dated December, 1995; (iv) Landlord's Non-Disturbance Agreement among Charlie Sing and Charlie James Sing as Fee Owner, Gerald A. Tadlock as Groundlessee and Coastal Limited Partnership, a South Carolina limited partnership, as Sublessee, dated September 15, 1987 and recorded January 21, 1988 in Deed Book 1193 at page 296; (v)  Estoppel, Modification of Ground Lease and Clarification of Landlord's Non-Disturbance Agreement dated April 27, 1990 among Charlie Sing, Charlie James Sing, Gerald A. Tadlock, Tad's Land and Development Company, Inc., and Coastal Limited Partnership recorded May 21, 1990 in Deed Book 1393 at page 528; (vi) Estoppel Certificate and Second Clarification of Landlord's

Non-Disturbance Agreement; and (vii) Estoppel Certificate and Agreement among Charlie James Sing, Gerald A. Tadlock, Tad's Land and Development Company, Inc., Inlet Retail Associates, LLC, RAIT Partnership, L.P., and SC Fund VI Properties, L.P., dated October 3, 2005, and recorded October 11, 2005, in Deed Book 2992 at page 892, and (viii) Estoppel Certificate and Agreement among Dorothy Mason Jordan, Steven Thomas Jordan, Marian J. Thomson, Connie J. Koloditch, Gerald A. Tadlock, Tad's Land and Development Company, Inc., Inlet Retail Associates, LLC, RAIT Partnership, L.P. and SC Fund VI Properties, L.P., dated October 3, 2009, and recorded October 11, 2005, in Deed Book 2992 at page 907.

3.     Coastal Limited Partnership's interest was conveyed by Master's Deed to Metropolitan Life Insurance Company recorded August 2,1993 in Deed Book 1655 at page 105.

4.     Metropolitan Life Insurance Company's interest was assigned to Inlet Square Properties, L.L.C., by Assignment dated December 22, 1995, recorded December 28, 1995 in Deed Book 1840 at page 666, as affected by Deed of Distribution conveying one-eighth interest of deceased Jim T. Jordan to Dorothy Mason Jordan and Steven Thomas Jordan, as Trustee to the Jim T. Jordan Trust Under Item V of the Last Will and Testament of Jim T. Jordan, dated December 17, 1996, recorded December 17, 1996, in Deed Book 1908 at page 1129.

5.     Inlet Square Properties, L.L.C. merged into SC Fund VI Properties, L.P., as set forth in Estoppel Certificate and Agreement dated February 10, 1998, recorded in Deed Book 2105 at page 677, as affected by Estoppel Certificate and Agreement dated February 23, 2001, recorded in Deed Book 2346 at page 611; assigned by Assignment of Leasehold Interest dated September 29, 2005, by and between SC Fund VI Properties, L.P., a Delaware limited partnership and Inlet Retail Associates, LLC, a South Carolina limited liability company, recorded in Deed Book 2992 at page 923.

6.     Assignment of Leasehold Interest by SC Fund VI Properties, L.P. to **Inlet Retail Associates, LLC** ("IRA"), dated October 5, 2005, recorded in Book 2992 at page 948.

7.     Second formal Amendment to Ground Lease dated December 29, 2006 by and between Tad's Land and Development Company, Inc. and Gerald A. Tadlock, as Landlord, and Inlet Retail Associates, LLC, as Tenant, as evidenced by Memorandum of Lease Agreement dated February 8, 2007 and recorded in Deed Book 3237 at page 2496.

8.     Tad's Land and Development Company, Inc. assigned its leasehold interest in the Jordan Lease to **West C Street Holdings, LLC** ("Ground Lease Landlord") by Assignment of Leasehold Interest dated December 27, 2007.

## SUMMARY

The Ground Lease Landlord for the Debtor is **West C Street Holdings, LLC**. The current term of the Ground Lease expires on July 14, 2047 (the "Original Term"); however, pursuant to a Second Formal Amendment to Ground Lease dated December 29, 2006, by and between IRA and the Ground Lease Landlord (the "Second Amendment"), IRA purchased the right to extend the Original Term of the Ground Lease, at its sole option (the "Extension Option"), for one option term of twenty (20) years (the "Option Term"), which Option Term, if exercised, would commence on July 15, 2047 and expire on July 14, 2067. In consideration of the Ground Lease Landlord's granting IRA this Extension Option, IRA was obligated to pay (i) $500,000 to the Ground Lease Landlord on or before January 12, 2007; and (ii) annual payments of $100,000 each on July 15, 2007, and each July 15 thereafter during the Original Term (July 15, 2008 through July 15, 2046) (for a total of forty (40) annual payments of $100,000 each).[1]

---

[1] RAIT advanced funds to IRA from the Acquisition and Development Portion of the Loan to fund the initial $500,000 Extension Option payment to the Ground Lease Landlord in January 2007, as well as both the July 15, 2007 and July 15, 2008 Extension Option payments to the Ground Lease Landlord.

## *IN RE: THE SIGN LEASE*

IRA leases an additional parcel called the Sign Tract, for the purpose of operating and maintaining a pylon lease for the benefit of Inlet Square Mall.

Reference is made to an unrecorded Lease Agreement dated February 1, 2001 between Tad's Land and Development Company, Inc., as Landlord, and SC Fund VI Properties, L.P., as Tenant. On information and belief, the Landlord, et al., obtained possession of the tract via the Ground Lease recorded in Deed Book 1193, page 250, previously described above. **Inlet Retail Associates, LLC** acquired possession via the 2005 Assignment of Leasehold Interest, previously described above.

Reference is made to an Amendment to Lease Agreement dated February 8, 2007, between Tad's Land and Development Company, Inc., as Landlord, and Inlet Retail Associates, LLC, as Tenant.

**West C Street Holdings, LLC** was assigned the leasehold interests of Tad's Land and Development Company, Inc. via instruments previously described above.

The Sign Lease Landlord for the Debtor is **West C Street Holdings, LLC**. The current term of the Sign Lease expires on July 14, 2047 (the "Original Sign Lease Term"); however, pursuant to that certain Amendment to Lease Agreement dated as of February 8, 2007 (the "Amendment to Sign Lease"), between Inlet Retail Associates, LLC and the Sign Lease Landlord, Inlet Retail Associates, LLC purchased the right to extend the Original Sign Lease Term, at its sole option (the "Sign Lease Extension Option"), for one option term of twenty (20) years (the "Sign Lease Option Term"), which Sign Lease Option Term, if exercised, would commence on July 15, 2047 and expire on July 14, 2067.

5. **OPERATIONS.**

IRA employs Urban Retail Properties, LLC ("Urban Retail") as the property manager for the operation of the Property pursuant to A certain Property Management and Leasing Agreement dated May 29, 2008, and made effective as of May 21, 2008, by and between IRA and Urban Retail (the "Management Agreement"). Urban Retail maintains the books and records of the operation of the Property, and the bank accounts used in the operation of the Property. It is contemplated that Urban Retail will continue to provide these services during the course of this case, until the Property is sold.

Currently, IRA is authorized to use cash collateral pursuant to a Court Order to that effect with RAIT Partnership, L.P. ("RAIT"), which holds a valid first lien on assets of IRA without limitation. All tenant income generated by the Property is subject to a lockbox arrangement under the control of RAIT. All of the tenants at the Property send their rental payments directly to the lockbox and RAIT then sends sufficient funds to Urban Retail to pay all operating expenses for the Property, with any excess tenant income being retained by RAIT. RAIT continues to send sufficient funds to Urban Retail to pay all budgeted operating expenses (set forth in the Court's Order authorizing the use of cash collateral); and in addition, RAIT has set up an Escrow Account to hold any excess funds primarily for the payment of Court-approved administrative expenses.

6. **MALL DESCRIPTION AND CONDITION.**

The Mall has the potential to include 3 anchor tenants, and approximately 22 smaller permanent tenants. Over the past two years, the Mall has suffered the loss of many of its tenants, so that now, the primary tenants consist of Kmart, Belk, JC Penney, Regal Cinemas, Stein Mart and Books-A-Million; and there are approximately 10 individual smaller permanent tenants.

The acquisition by IRA of its leasehold interests in the Property was funded in part by RAIT pursuant to the terms of a Loan and Security Agreement dated September 30, 2005 (as amended from time to time, the "Loan Agreement"). Under the terms of the Loan Agreement, RAIT agreed to advance up to

$21,475,000 to IRA (the "Loan"), with a portion of the Loan to be advanced for the purpose of partially financing the cost of acquiring the leasehold interests in the Property and funding various required reserve funds, and a portion of the Loan to be advanced, subject to certain requirements, for improvements to the Property and other uses in connection with the Property.

The Loan is secured by a first priority mortgage on and assignment of IRA's ground lease rights and interests; an assignment of leases and rents of the Property; a security interest in all personal property which is a part of, or owned in connection with, the Property; a security interest in and assignment of the rents, profits, income, accounts and other sources of revenue of the Property; an assignment of contract rights relating to the Property; and the proceeds of all such property.

IRA commenced construction of various capital improvements and renovations in the Fall of 2007. RAIT asserted that IRA failed to comply with the terms of the Loan Agreement by failing to follow the construction budget and by failing to comply with the other conditions precedent to draw requests for funding improvements under the Loan, and that such failure by IRA constituted a breach of the Loan Agreement. Notwithstanding IRA's position contrary to the foregoing, RAIT refused to fund the draw requests for costs incurred by IRA for capital improvements and renovations.

In addition to the asserted defaults of failure to comply with the construction budget and failure to comply with conditions precedent to draw requests, the income from the Property was not, and is not, sufficient to make the debt service payments required under the Loan, and IRA failed to make such payments. Accordingly, pursuant to a certain letter dated June 12, 2008 (the "Default Letter"), RAIT formally notified IRA in writing that IRA was in default under certain monetary and non-monetary terms of the Loan, as more particularly set forth in the Default Letter. Certain matters contained in the Default Letter were later withdrawn and/or revised by RAIT.

As of February 13, 2009, RAIT asserts that the following amounts are due under the Loan:

| | |
|---|---:|
| Principal | 16,304,584.70 |
| Late Charges | 77,598.17 |
| Late Charge on Principal | 407,614.62 |
| Interest (Non-Default) | 1,004,929.98 |
| Default Interest | 628,081.24 |
| Exit Fee | 244,568.77 |
| Loan Balance (2/13/09) | 18,667,377.48 |

As a result of RAIT's refusal to fund construction based on the alleged defaults, IRA was unable to pay contractors who provided goods and services to the Property, many of the renovations are incomplete, and five mechanics' liens actions, aggregating over $3 million in claims against the Property, were filed as of the filing of this case.

IRA's debt obligations fall into the several primary categories: (i) the indebtedness owed to RAIT for the Loan secured by the leasehold mortgage on the Property; (ii) ongoing monthly rental obligations owed to the Ground Lease Landlord pursuant to the Ground Lease; (iii) ongoing monthly rental obligations owed to the Sign Lease Landlord pursuant to the Sign Lease; (iv) future annual Ground Lease Extension Option obligations owed to the Ground Lease Landlord pursuant to the Second Amendment (discussed above); (v) operating expenses of the Property, including fees and expense reimbursements to Urban Retail under the Management Agreement; (vi) existing indebtedness owed to the various contractors as evidenced by the mechanics' liens filed to date; and (vii) existing trade and other debt of approximately $570,000.00.

IRA is current with all rental payments owed to the Ground Lease Landlord; however, it has ongoing rental obligations approximating $45,600 per month (Base Rent only) that must be paid in order to

maintain the Ground Lease. IRA is also current with all rental payments owed to the Sign Lease Landlord; however, it has ongoing rental obligations that must be paid in order to maintain the Sign Lease of $302.50 per month through October 31, 2013, with such annual rent being increased every five-year period by ten percent (10%) over and above the preceding 5-year period's annual rental amount.

IRA is current with all Ground Lease Extension Option payments owed to the Ground Lease Landlord; however it has a $100,000 payment obligation due every July 15th during the Original Term of the Ground Lease. IRA is generally current in the payment of the regular operating expenses of the Property, excluding payments due to RAIT on the Loan and payments due to contractors involved in the renovation of the Property.

Primarily based on the foregoing, the Mall has remained in a state of disrepair. Compounded by the effects of the recession, the ability of IRA to obtain additional funding became impossible, and with ensuing litigation and tenant attrition, IRA was forced to file this bankruptcy case as its only viable means of handling the estate.

## 7. OTHER FINANCIAL DATA OF IRA.

The average operating budget for the Debtor is as follows. It is the Debtor's intent to follow this Budget generally, which was attached to the Court's Order to use cash collateral with RAIT, until this case is concluded or the Property is sold, whichever comes first. Revenue figures are estimated only, dependent upon the timely receipt of rents.

| INCOME (Averages) | |
|---|---:|
| Rental Income | 190,183.33 |
| Temporary Tenant Income | 5,158.33 |
| Percentage Rent | 1,300.00 |
| Common Area Recovery | 25,166.67 |
| Real Estate Taxes Recovery | 6,858.33 |
| Utilities Recovery | 3,775.00 |
| HVAC Recovery | 941.67 |
| Marketing Income | 2,891.67 |
| **TOTAL INCOME** | **236,275.00** |
| | |
| **EXPENSES (Averages)** | |
| Cleaning | -20,775.00 |
| Fire/Life Safety | -183.33 |
| Landscaping | -4,208.33 |
| Parking & Walkways | -2,133.33 |
| Trash Removal | -2,100.00 |
| Repairs & Maintenance | -883.33 |
| HVAC | -525.00 |
| Security | -18,558.33 |
| Utilities | -20,700.00 |
| Insurance | -11,815.33 |
| Professional, Contract Services | -5,116.67 |
| On Site Expense | -13,475.00 |
| Property Taxes | -19,266.67 |
| Management Fees | -12,500.00 |

| | |
|---|---:|
| Marketing | -2,891.67 |
| Leasing | -775.00 |
| Ground Rent | -45,916.15 |
| **TOTAL EXPENSES** | **-181,823.15** |
| | |
| **NET OPERATING INCOME** | **54,451.85** |
| | |
| **AMOUNT TO BE FUNDED EACH MONTH** | **150,741.15** |

Historically, the Mall generated approximately $3,415,000 in gross annual revenues for the years 2007, and $2,276,000 for 2008. Year-to-date, the Mall has revenues of approximately $1,003,000. Since 2007, tenancy has dropped off dramatically, due in part to the Mall's condition and in part to the economic recession affecting all retail facilities.

Going forward, the Debtor is without sufficient funds to complete the renovations or to continue operations. RAIT will not fund operations on a long term basis, and the ability to generate funding with new lenders is impractical given the stated conditions.

8. **THE PLAN OF REORGANIZATION.**

The following describes the Plan concepts. Whenever a conflict appears between any provisions set forth in the Disclosure Statement and the terms of the actual Plan, the Plan will govern. This applies to Plan amendments that do not materially affect the contents of the Disclosure Statement.

**Overview**

The Plan provides for the sale of the Property and the payment of the net sale proceeds (i.e., gross sale proceeds minus closing costs, commissions, prorations and other usual and customary charges to a seller of real estate) to creditors with allowed claims.  The Property, which includes the Ground Lease, the Sign Lease and the Debtor's interest in the improvements on the Property (and as much of the personal assets of the Debtor as is necessary, but excluding computers, software and other firmware needed for the Debtor's records and bookkeeping), will be (and has been) marketed for sale by CB Richard Ellis, Inc. ("CBRE"), which was authorized by the Court to provide such services.  The Property shall be sold "AS-IS," at such highest and best price as the market will bear.  The final deadline for obtaining contracts for the sale of the Property shall be August 17, 2009 (such period of time through August 17, 2009 being the "Sale Period").

**Sale Process**
RAIT holds a lien on the Property securing a debt to RAIT in the approximate amount of $19 million. RAIT has agreed that it will consent to a cash sale of the Property by the Debtor at a sale price of $3,500,000.00 (the "Minimum Acceptable Price") or higher.  In the event that the Debtor is unable to obtain a contract for a cash sale of the Property at the Minimum Acceptable Price or higher within the Sale Period, RAIT or its designee (RAIT and its designee, if any, are collectively referred to throughout this Plan as "RAIT") shall purchase the Property.   The RAIT purchase offer is made a provision of this Plan and RAIT need not file or submit any other document restating it.

In conjunction with these Plan provisions, the Debtor may also file motions seeking authorization for the sale of the Property and for entry of a bidding procedures order, defining the procedure applicable to the sale.  In the event that no offers to purchase the Property are received within the Sale Period other than RAIT's offer, the Debtor may elect not to file a separate motion for authorization of the sale, and confirmation of this Plan by the Court shall serve as authorization for the sale of the Property to RAIT upon its credit bid, as provided below.

RAIT's offer to purchase the Property shall be deemed to be in the amount of the Minimum Acceptable Price. In the event that RAIT is the purchaser of the Property, its purchase shall be made by credit bid (the "Credit Bid") under Section 363(k) of the Code. RAIT's purchase of the Property shall be free and clear of all liens, claims, encumbrances and interests under Section 363(f) of the Code, as provided in section 2.4 below. In its sole discretion, RAIT may elect to accept the conveyance of the Property subject to its existing liens and the balance of indebtedness secured by those liens (but free and clear of all other liens, claims, encumbrances and interests), such that its mortgage indebtedness will remain intact post-consummation of a sale to it.  However, even if RAIT elects during the Sale Period to purchase the Property by accepting the Property subject to its existing liens, RAIT's Credit Bid offer, for purposes of competing offers/bids for the purchase of the Property, shall be deemed to be in the amount of the Minimum Acceptable Price.  A sale to any purchaser other than RAIT shall be for cash only.

Notwithstanding anything to the contrary contained herein, and notwithstanding RAIT's Credit Bid purchase offer, if a prospective good faith purchaser (other than RAIT) makes a firm offer to purchase the Property (such offeror being a "Bidder") upon terms higher (and better) than RAIT's Credit Bid, i.e., at the Minimum Acceptable Price or higher, then this Bidder shall become the primary purchaser (the "Successful Bidder") with RAIT remaining only as a backup Bidder (any Bidder approved for the purchase of the Property as a stand-by or backup purchaser in the event the Successful Bidder fails to close its purchase hereinafter being a "Backup Bidder").  Bidders shall have conducted their due diligence investigation of the Property **prior** to making offers to purchase the Property, and must close on the sale with five (5) business days after an Order of the Court approving the sale is entered.

If two or more good faith purchasers or Bidders make offers to purchase the Property upon terms higher (and better) than RAIT's Credit Bid, i.e., at the Minimum Acceptable Price or higher, then an auction will be conducted to determine which of the Bidders shall be the Successful Bidder for the purchase of the Property.  Subject to the Court's schedule, the auction to determine the Successful Bidder shall be conducted on the earliest possible date following the end of the Sale Period, in a hearing before the Court; provided, however, that the Debtor and RAIT may jointly determine that a date other than the first available date for the auction and hearing is better suited for the sale and seek to have the auction and sale scheduled on that other date.  The Bidder with the second best purchase offer shall become the Backup Bidder, and RAIT shall remain as an additional Backup Bidder.

Any acceptable and qualifying purchase contract(s) for the sale of the Property must be approved by the Court, in accordance with Sections 363(b) and (f) of the Code, which allow for sales free and clear of liens, claims, encumbrances and interests. If a contract for the purchase of the Property is received during the Sale Period from a Bidder other than RAIT at the Minimum Sale Price or higher, then the Debtor, with the advice and consent of RAIT, and the advice of CBRE, will determine if the contract is an acceptable contract.  If the contract is acceptable, the Debtor will file a motion seeking authorization for the sale of the Property under the contract.  If a bidding procedures order has not already been entered by that time, the Debtor may also file a motion to establish bidding procedures and, if applicable, bid protections.  The proposed sale will be noticed to creditors and parties in interest, and the proposed sale will be subject to higher and better offers.   Any motion to sell (or auction) the property will ask the Court to determine the purchaser to be a good faith purchaser under Section 363(m) of the Code.  The sale of the Property, once authorized by the Court, is incorporated into this Plan.

In the event of an auction among Bidders, the Debtor will obtain an order of the Court confirming the Successful Bidder at the auction as the successful purchaser of the Property.  In the event no offer is received at the Minimum Acceptable Price within the Sale Period, the Debtor will obtain an order of the Court confirming the sale of the Property to RAIT pursuant to RAIT's Credit Bid.  If a Bidder other than RAIT is the Successful Bidder and the proposed sale of the Property to the Successful Bidder fails to close within five business days after entry of the Order authorizing the sale (which time may be extended upon the consent of the Debtor and RAIT), then the Debtor will convey the Property (i) to the Backup Bidder, if any, within seven business days thereafter, or (ii) to RAIT, if there be no Backup Bidder other than RAIT or if the Backup Bidder fails to close the purchase of the Property within the seven day period.

If RAIT is the successful purchaser of the Property, then the fees-commissions due CBRE will be limited to the break-up fee described in the Listing Agreement previously approved by the Court.

Whether the sale of the Property occurs by motion for authorization upon a contract of sale or by auction, the Debtor reserves the right to request approval of Back-Up Bids for the purchase of the Property, which Back-Up Bids would close in the event that the primary approved sale of the Property does not close. In such event, the Debtor will be authorized to close the sale of the Property to the next-in-line Back-Up Bidder without further authorization from the Court.

**The Carve-Out**
Upon any sale event (with a third-party purchase contract, with RAIT or via auction), assuming the sales price is below the $19,000,000 lien to RAIT, there would be no dividends payable to other creditors. However, RAIT has agreed to allow a "carve-out" of the sales price (the "Carve-Out") to be earmarked for the allowed claims of general unsecured creditors.. The Carve-Out will be fixed at $120,000.00 for a sale at a price of up to $7,000,000.00; it will increase to the fixed amount of $200,000.00 for a sale at a price between $7,000,001.00 and $10,000,000.00; and it will be fixed at $300,000.00 for a sale at a price over $10,000,001.00. The Carve-Out will be due and payable only upon the closing of a sale, based upon the price of that closed sale. If the Property is sold to RAIT or its designee pursuant to its Credit Bid under Section 363(k), the Carve-Out shall be fixed in the amount of $120,000.00, and the purchaser (RAIT or its designee) will be required to pay cash to the estate in the amount of $120,000.00 upon that sale. The Carve-Out will be set aside into a separate non-interest-bearing escrow account and will not be used for the general or administrative claims of this case.

RAIT has consented to allow use of cash collateral for the payment of administrative expenses in this case, as approved in the cash collateral budget, for approved professional fees and expenses, and for payment of filing fees to the Court and quarterly fees due to the United States Trustee. The income from the Property is expected to be sufficient to fund these administrative expenses; however, in the event that the income from the Property is not sufficient to cover these administrative expenses, RAIT has agreed that the Carve-Out will be increased by an amount sufficient to cover the amount of the administrative expenses in excess of the Property income, except upon a sale of the Property at a price in excess of $10,000,000.00.

**Sale of the Property Free and Clear**
The sale of the Property under the provisions of this Plan shall be a sale free and clear of all liens, claims, encumbrances and other interests pursuant to Section 363(f) of the Code, with the limited exception of a sale to RAIT (or its designee) by RAIT's Credit Bid in which RAIT determines to accept the Property subject to its existing liens. If RAIT is the Successful Bidder as a result of its Credit Bid and it elects to accept the Property subject to its existing liens, RAIT (or its designee) shall receive the Property subject to the existing RAIT lien(s) but free and clear of all other liens, claims, encumbrances and interests.

In the absence of timely filed objections to the sale of the Property, the sale of the Property under the provisions of this Plan shall be deemed to be a sale made with the consent of all entities possessing an interest in the Property pursuant to Section 363(f)(2) of the Code. In the event of an objection to the sale of the Property by an entity asserting a lien on or interest in the Property, the sale of the Property under the provisions of this Plan will be made pursuant to Sections 363(f)(3) and/or (4). The objecting entity shall have the burden of proving the validity, priority and extent of its asserted interest in the Property pursuant to Section 363(p)(2).

The sale of the Property under the provisions of this Plan also shall be deemed authorized upon confirmation of the Plan pursuant to Section 363(b)(1) of the Code, as a sale other than in the ordinary course of business.

**Settlement of Pending Litigation and Release of All Parties to Such Litigation**
All contested litigation with mechanics lien holders will cease against all parties to such litigation with general and mutual releases, with the holders' claims being established in this Court and moved from

secured status (due to the recognized insufficiency of collateral value to support such claims over and above the RAIT lien) to the class of general unsecured creditors.  Confirmation of this Plan shall be binding in the settlement and release of all parties to such litigation.

**Distributions to Creditors**
The sale proceeds due to RAIT for its compromised secured claim (i.e., the sale proceeds less normal closing costs, and less the Carve-Out) will be paid to RAIT or its designee at the closing of the sale of the Property.  The Debtor anticipates distribution of funds from the Carve-Out as soon as the claims review process becomes final. If additional funds are made available to the Debtor (through successful prosecution of collection litigation, for example, net of applicable fees and costs), they will be distributed to the class of general unsecured creditors as soon as possible. For that reason, the Debtor's legal status will remain active for the foreseeable future. The designated Disbursing Agent will make the appropriate payments to the classes of creditors in accordance with their priorities.

The Plan contains a chart for the various classes of claims. Reference is made to that chart for other specifics on the handling of claims.

The Debtor will review the estate's records and filings for potential avoidable transfers, but will determine whether or not to pursue such potential actions after a cost-benefit analysis is conducted. At this point, the Debtor does not anticipate pursuing such actions unless the assessed chances of success are significant.

Nathan P. Fishkin will act as Disbursing Agent for the Debtor, and will continue to serve the Debtor after a sale consummates. The Disbursing Agent will be in charge of handling the funds to be distributed. He will work without compensation. The Disbursing Agent will maintain proper records of all funds and distributions, and will provide such records to any parties in interest upon written request.

The Plan will take effect on the "Effective Date," which is 10 business days after the date the Bankruptcy Court's Order confirming the Plan has become final, in that the time to appeal or seek reconsideration of the Order has elapsed, and no appeals regarding the Order of Confirmation are pending.  Consummation of the specific actions called for in the Plan by necessity may and are allowed to occur after the Effective Date, but best efforts will be put forth by the Debtor to insure that consummation occurs as close to the Effective Date as is possible.

The Debtor, from and after confirmation of the Plan, will be indebted for and obligated to pay <u>only</u> those obligations and liabilities as set forth therein, if any, and the remainder of the same will be forever discharged.

9.  **POST-CONFIRMATION FINANCIAL AND OTHER INFORMATION.**

Legal and accounting fees will continue until all bankruptcy litigation and disbursements are finalized. Attorney's fees for Ivan N. Nossokoff, LLC, attorney for the Debtor, and accountants/consultants for the Debtor (tax and audit services) will continue post-closing.  Estimates for these expenses are running about $50,000 legal fees for the Debtor, plus $45,000 legal fees for RAIT's legal counsel; and in addition, US Trustee quarterly fees will continue until the case is closed, and the Debtor estimates the amount to be due in that category at approximately $18,000.

The anticipated Federal tax consequences of the actions proposed by the Plan are as follows: None. Subject to further investigation by the Debtor's tax advisors, any positive tax consequences resulting from an asset sale will be offset by its losses being carried forward.

The Debtor will destroy books and records affecting this case (not otherwise transferred to the purchaser) after one (1) year following the confirmation date.  In the event a party in interest or an employee wishes to retrieve his/her/its records, they will be made available by the Disbursing Agent.  If no such requests are received, then the Disbursing Agent is authorized to destroy those records, and the Debtor shall not be liable for any further responsibility or liability to the party in interest or the employee, for retention of the records or for any causes of action as a result of the employment with Debtor or otherwise.

10. **COMPARISON UNDER CHAPTER 7 (LIQUIDATION ANALYSIS).**

It is provided in §1129(a)(11) that in order for a Plan of Reorganization to be confirmed, it must be demonstrated that it is not likely to be followed by a liquidation or the need for further reorganization of the Debtor or any successor of the Debtor under the Plan, unless the liquidation or reorganization is proposed in the Plan of Reorganization itself. This Plan proposes primarily a liquidation program after divestiture of all of its assets via a sale process.

Assuming the liquidation of assets to occur in this Chapter 11 case, and assuming the sale has taken place, it is expected that the Carve Out amount set-aside will be available to holders of allowed unsecured claims. In this particular case, if the Debtor were converted to a Chapter 7 liquidation after the sale has been consummated, another level of administrative charges will overtake the said fund, thereby diminishing the potential dividends to unsecured creditors.

However, if the case is converted before a sale is consummated (or if it is not approved by this Court), then it is expected that the Debtor's ongoing operations will cease, and RAIT, with its blanket lien on all assets, will take possession of the assets and leave the Debtor with an additional unsecured deficiency claim. It is clear that there would be absolutely no funds remaining to pay any dividends to the class of general unsecured creditors  Thus, the best course of action for the benefit of the estate as a whole is the sale of the Debtor's assets via the proposed sales process.

11. **CONCLUSION.**

Readers of this Disclosure Statement are directed to the Plan for specific treatment of their particular rights or claims against the Debtor. The Debtor is of the opinion that the provisions of the Plan satisfy the claims against the Debtor in a manner providing each the maximum value to fairly and equitably satisfy these claims. Furthermore, it appears that the unsecured creditors will receive much more through this Plan than through Chapter 7 liquidation.

RESPECTFULLY SUBMITTED on JUNE 25, 2009 at Charleston, South Carolina.

                                        **/s/ NATHAN P. FISHKIN**
                                        **NATHAN P. FISHKIN, for**
                                        **Inlet Retail Associates, LLC**
                                        **Debtor in Possession**