**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re: | Case No.  09-02083-jw |
| Inlet Retail Associates, LLC, | Chapter  11 |
| Debtor. | |

**MOTION FOR ORDER ESTABLISHING BIDDING AND OTHER PROCEDURES IN CONNECTION
WITH THE SALE OF PROPERTY, AND MEMORANDUM IN SUPPORT OF MOTION**

Inlet Retail Associates, LLC ("IRA"), as the debtor and debtor-in-possession in this case,  hereby moves (the "Motion") pursuant to 11 U.S.C. §§105(a) and 363(b) and (f), and Rule 6004 of the Federal Rules of Bankruptcy Procedure, for the entry of an order establishing bidding and other procedures in connection with the sale of property of the bankruptcy estate.  This Motion is filed in conjunction with IRA's Plan of Reorganization by Debtor-in-Possession (the "Plan") filed on June 25, 2009, which provides for the sale of substantially all assets of the estate.

IRA owns certain leasehold interests in real property, improvements and associated personalty which comprise a shopping mall known and operated as the "Inlet Square Mall," which is located in Murrells Inlet, South Carolina (the "Property").  The Plan provides for the sale of the Property free and clear of all liens, claims, encumbrances, and other interests pursuant to 11 U.S.C. §§ 363(b)(1) and (f), except for Assumed Liabilities (as such term is defined in the form Asset Purchase Agreement (the "APA") attached to this Motion and incorporated herein by reference) and any and all easements, covenants, conditions, restrictions and other matters of record relating to the real property included in the sale.  The Property is subject to liens held by  RAIT Partnership, L.P. ("RAIT"),  securing indebtedness to RAIT in the approximate amount of $19 million.  The Plan provides that RAIT or its designee (RAIT and its designee, collectively, "RAIT")  will purchase the Property by credit bid under 11 U.S.C. § 363(k) for the price deemed for purposes of competitive bidding to be in the amount of $3,500,000.00 (the "Minimum Acceptable Price").  IRA has employed the services of CB Richard Ellis, Inc. ("CBRE") to market the Property, and the proposed sale to RAIT is subject to cash offers from other prospective purchasers at the Minimum Acceptable Price or higher within the allowed sale period, such that if a cash offer at the Minimum Accpetable Price or higher is received for the Property within the prescribed time, IRA will be

authorized to sell the Property to that offerer.   IRA files this Motion in support of the sale under the Plan.

IRA seeks to establish a procedure by which offers from prospective buyers other than RAIT (such offers from other prospective buyers being referred to as "competing bids," and such other prospective buyers being referred to as "bidders") may be made for the Property.   Accordingly, IRA is informed and believes that an Order should be entered establishing bidding procedures governing the sale process.

Specifically, IRA requests that the Court enter an order establishing bidding procedures (the "Bidding Procedures") providing as follows:

1.   Any bid from any persons or entity other than RAIT to purchase the Property, in order to be a qualifying bid (a "Qualified Competing Bidder" and a "Qualified Competing Bid"), shall:   (A) be in the form of the APA executed by the bidder; (B) contain terms and conditions that are substantially similar to or otherwise more beneficial to the estate than the APA; (C) be accompanied by a written acknowledgement and agreement that the terms of the bid are substantially similar to or more beneficial to the estate than the APA, and that the bidder, should it be declared the winning bidder, will enter into an asset purchase agreement with IRA confirming the terms of such winning bid; (D) equal or exceed the Minimum Acceptable Price; (E) include satisfactory evidence of the financial ability of the bidder to consummate the purchase for cash; (F) include a deposit of ten percent (10%) of the competing bid amount in certified funds payable to CB Richard Ellis, Inc. as agent for IRA; and (G) be received by CBRE no later than the close of business on August 17, 2009. Upon receipt, CBRE shall promptly deliver copies of any competing bids to IRA and RAIT.  No competing bid shall be considered by IRA or the Court unless it is a Qualified Competing Bid and no bidder shall be permitted to participate in the auction process unless it is a Qualified Competing Bidder. IRA and RAIT reserve the right to object to any bid being deemed a "Qualified Competing Bid."  If there is a dispute as to a bidder, the same shall be permitted to participate in the Sale Hearing (defined in paragraph 2 below) and the Court will resolve the dispute.

2.   In the event CBRE receives one or more Qualified Competing Bids, IRA shall promptly file a report of the Qualified Competing Bids and the Court shall conduct hearing (the "Sale Hearing") on the Qualified Competing Bids on August 24, 2009 at 2:00 p.m., or as soon thereafter as the matter may be heard, in the courtroom located at 145 King Street, Room 225, Charleston, South Carolina.  At that time, IRA will report to the Court on the status of the Qualified Competing Bids, and the Court shall conduct an auction for the sale of the Property.  Only  parties who submit Qualified Competing Bids in compliance with the provisions of paragraph 1 above shall be permitted to participate in the auction at the Sale Hearing.   The bidding at the Sale Hearing shall proceed as provided in paragraph 3 below.

3.   If more than one Qualified Competing Bid is received, each Qualified Competing Bidder shall have the right to increase their bids at the Sale Hearing.  However, any higher bid of Qualified Competing Bidders shall be subject to the acceptance of a still higher and better bid ("overbid") submitted during the Sale Hearing in compliance with this section; provided, however, that such overbid shall equal the sum of: (i) the higher of the Minimum Acceptable Price or the highest Qualified Competing Bid immediately preceding the overbid, plus (ii) an additional amount of at least One Hundred Thousand and 00/100 Dollars ($100,000.00) (a "Yet Higher Offer"). In the event of a Yet Higher Offer, the process set forth in the immediately proceeding sentence shall continue, with each

NPCOL1:1718935.1

Qualified Competing Bidder having the continuing right to submit an overbid, unless and until such time as Qualified Competing Bidders elect not to make further overbids. The highest or otherwise best offer at the Sale Hearing shall be deemed the winning bid (the "Winning Bid", made by the "Winning Bidder").

4. At the conclusion of the Sale Hearing, the Court will determine the Winning Bidder, and determine authorization for the sale of the Property. As set forth in paragraph 6 below, IRA may also seek authorization to make the sale to a "back-up" bidder in the event the Winning Bidder at the Sale Hearing does not consummate the purchase of the Property.

5. In the event that no Qualified Competing Bids are received, RAIT will be deemed the Winning Bidder and IRA will be authorized to convey the Property to RAIT pursuant to the Plan.

6. In the event that a Qualified Competing Bid is received, IRA will request that the Court approve a "back-up" bid (the "Back-up Bid", and the "Back-up Bidder"). As provided in the Plan, RAIT's credit bid under § 363(k) shall be deemed a Back-up Bid; in addition the second highest Qualified Competing Bid (if any) at the Sale Hearing shall be the Back-up Bid, and RAIT's credit bid shall be a final Back-up Bid. If the Winning Bidder is unable to close the sale within the time required for the closing by the asset purchase agreement, the Winning Bidder shall forfeit its deposit made pursuant to paragraph 1(F) above, and IRA shall close the sale of the Property to the next-in-line Back-Up Bidder without the necessity of obtaining another order from this Court. No Qualified Competing Bidder whose Bid is not deemed to be the successful bid at the conclusion of the Sale Hearing shall be required to act as a Back-Up Bidder; however, unless and until the unsuccessful Qualified Competing Bidder notifies IRA of its unwillingness to be a Back-Up Bidder, CBRE may hold the deposit until the deposit is due for return under paragraph 7 below.

7. The deposit made by any Qualified Competing Bidder, pursuant to paragraph 1(F) above, who is not either the Winning Bidder or the Back-Up Bidder shall be returned to such Qualified Competing Bidder within three (3) business days after the Sale Hearing. The deposit made by any Qualified Competing Bidder that is designated as a Back-Up Bidder shall be returned to such Qualified Competing Bidder within three (3) business days after the closing of the sale of the Property to the Winning Bidder.

8. Acceptance by IRA of a Qualified Competing Bid as a Winning Bid or a Back-Up Bid shall, in all respects, be subject to the entry of the sale order by the Court authorizing IRA to consummate the sale.

9. If a Qualified Competing Bid is accepted by IRA as the Winning Bid or Back-Up Bid, the Qualified Competing Bid shall remain open and irrevocable through closing of the sale of the Property.

10. Any dispute regarding any aspect of the foregoing bidding procedures shall be resolved by the Court.

11. The Bidding Procedures Order may be amended by the Court at any time prior to the conclusion of the Sale Hearing upon a finding that its terms are not in the best interest of the estate.

IRA is informed and believes that the above bidding procedures are important to support the sale of the Property under the Plan. The establishment of bidding procedures will insure an orderly and fair mechanism for evaluating competing offers and will allow competing bidders an opportunity to increase

NPCOL1:1718935.1

their bids, thereby maximizing the value of the Property.  See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558 (8th Cir. 1997); In re Gould, 977 F.2d 1038 (7th Cir. 1992)(holding that the adoption of detailed bidding procedures was within the court's discretion).

WHEREFORE, IRA requests that the Court enter an order approving and implementing the bidding procedures set forth hereinabove, and provide such other and further relief as the Court deems necessary and proper.

RESPECTFULLY SUBMITTED on this the 8th day of July, 2009, at Charleston, South Carolina.

**/s/ Ivan N. Nossokoff**
**Ivan N. Nossokoff, Esq.**
**District Court No.  2556**
**IVAN N. NOSSOKOFF, LLC**
**1470 Tobias Gadson Blvd, Suite 107**
**Charleston, SC  29407**
**843-571-5442**
**Attorney for Debtor**

4

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is entered into as of the ___ day of June, 2009 by and between _____, LLC, a limited liability company formed under the laws of the State of _____ (the "Buyer"), whose address is _____ and INLET RETAIL ASSOCIATES, LLC (the "Seller"), a South Carolina limited liability company, whose address is 10125 Highway 17 Bypass, Murrells Inlet, South Carolina 29576.

## RECITALS:

A.      Seller filed for relief under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. § 101 et seq.) on March 19, 2009, and its case is Case No. 09-02083-jw (the "Case") in the United States Bankruptcy Court for the District of South Carolina (the "Court"). Seller is in possession of its assets and is operating its property as a Chapter 11 debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

B.      Seller owns certain interests in real property located in Horry County, South Carolina, having a street address of 10125 Highway 17 Bypass, Murrells Inlet, South Carolina, with buildings and other improvements used in connection with the operation of a retail shopping mall commonly known as the "Inlet Square Mall" (hereinafter referred to as the "Property").

C.      Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Property and associated assets, as more particularly described hereinbelow, upon the terms and conditions set forth hereinbelow.

NOW, THEREFORE, in consideration of the mutual promises contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      <u>Definitions</u>.  The following terms shall have the following meanings:

(a)      "Accounts Payable" shall mean all debts owed by Seller.

(b)      "Accounts Receivable" shall mean all debts owed to Seller.

(c)      "Agreement" shall mean this Asset Purchase Agreement, including the schedules, exhibits and attachments hereto, as amended.

(d)      "Assets" shall mean the Ground Lease, Sign Lease, Improvements, Accounts Receivable, Personal Property, Intangible Personal Property and Intellectual Property (as each of those terms are defined herein), but excluding the fee title to the Land itself..

(e)      "Assignment of Contracts" has the meaning set forth in Section 3(b)(iii) of this Agreement.

(f)      "Assignment of Leases" has the meaning set forth in Section 3(b)(iv) of this Agreement.

1

(g)     "Assumed Liabilities" shall mean Seller's obligations under the Leases, Contracts and liabilities arising from operation of the Business after the Closing Date.

(h)     "Bill of Sale" has the meaning set forth in Section 3(b)(ii) of this Agreement.

(i)     "Books and Records" shall mean all files, books and records (including computer records) of Seller relating to the Assets and the Business including, without limitation, general business records and account records, supplier lists, mailing lists, advertising materials, customer lists, customer credit information and technical data.

(j)     "Business" shall mean the business of owning and operating the Property, as currently operated at the Premises.

(k)     "Buyer" shall have the meaning set forth in the introductory paragraph of this Agreement.

(l)     "Closing" shall have the meaning set forth in Section 3(a) of this Agreement.

(m)     "Closing Date" shall have the meaning set forth in Section 3(a) of this Agreement.

(n)     "Code Sections 363 and 365" shall mean Sections 363 and 365 of Title 11, United States Code.

(o)     "Consideration" shall mean (i) Buyer's assumption of Seller's obligations under the Leases and Contracts arising after the Closing Date; (ii) Buyer's assumption of liabilities arising from operation of the Business after the Closing Date; and (iii) cash in the amount of _____.

(p)     "Contracts" shall mean all contracts incident to the operation of the Business including warranties, customer contracts, gift certificates and leases (other than the Leases) that are set forth on Schedule 6(b) attached hereto and incorporated herein.

(q)     "Court" means the United States Bankruptcy Court for the District of South Carolina.

(r)     "Deed" has the meaning set forth in Section 3(b)(i) of this Agreement.

(s)     "Improvements" shall mean all of the existing buildings, structures and other improvements located upon the Land, including but not limited to a shopping mall, signs, parking lots, storm water drainage system, irrigation systems, offices and all other improvements located on the Land.

(t)     "Intangible Personal Property" shall mean (a) all governmental permits, approvals, licenses and certificates of occupancy; (b) all architectural and engineering drawings; (c) telephone numbers and promotional materials associated with the Business; (d) Internet

2

domain names and websites; (e) all product and service warranties and guarantees associated with the Assets; (f) the Seller's policy manuals, business plans and information, marketing plans and information, customer lists, and databases that relate to the Business; (g) Book and Records; and (h) all goodwill associated with the Business.

(u)     "Intellectual Property" shall mean all trademarks/service marks (including the goodwill associated with such trademarks/service marks), trade names, logos, copyrights, trade secrets, inventions, designs, processes, know-how and other intellectual property rights developed, acquired or otherwise owned by the Seller that are related to the Business, including but not limited to, those Intellectual Property rights listed in Attachment 1 to Schedule 1.1 attached hereto and incorporated herein by reference.

(v)     "Land" shall mean that real property described in Schedule 1.2 attached hereto and incorporated herein by reference, and all rights appurtenant thereto, including but not limited to water rights and conservatory tax credits, if any.

(w)     "Leases" shall mean the leases between the Seller and third parties set forth on Schedule 6(b) attached hereto, to the extent not disapproved by Buyer during the Due Diligence Period (as defined in Section 5(a) below).  Schedule 6(b) shall be updated at Closing.

(x)     "Outside Closing Date" shall have the meaning set forth in Section 3(a) of this Agreement.

(y)     "Personal Property" shall mean all tangible personal property owned by the Seller located on or used in the operation, maintenance, repair or ownership of the Business, including but not limited to all of the furniture, fixtures, equipment, signage, inventory, golf carts, motor vehicles, photographs, maps, artwork, fitness equipment and other tangible personal property used in connection with the operation, maintenance, repair or ownership of the Business, including, without limitation, all furniture, fixtures and pool, maintenance and kitchen equipment currently located on the Land and/or within the Improvements, but excluding computers, software and other firmware needed for Seller's records and bookkeeping.

(z)     "Premises" shall mean the real property and improvements located at 10125 Highway 17 Bypass, Murrells Inlet, South Carolina 29576, which is more particularly identified in Schedule 1.2 attached hereto and incorporated herein.

(aa)     "Seller" shall have the meaning set forth in the introductory paragraph of this Agreement.

2.     Agreement to Sell and Purchase; Payment of Consideration; Deposit.     In exchange for the Consideration, Seller agrees to sell the Assets to Buyer, and assign Seller's obligations under the Leases and Contracts to Buyer, and Buyer agrees to purchase the Assets from Seller and assume the Assumed Liabilities.

Simultaneous with the delivery of this Agreement, Buyer has provided to Seller's agent, CB Richard Ellis, Inc. ("CBRE"), a deposit in the amount of ten percent (10%) of the cash component of the Consideration (the "Deposit").   The Deposit shall be applied to the

NPCOL1:1710653.1

Consideration to be paid in cash, or paid in accordance with this Section 2 or other applicable sections of this Agreement.

The cash portion of the Consideration, plus or minus any adjustments pursuant to Section 3(f) hereof, shall be paid by Buyer delivering such amount to the Seller in cash at the Closing. As used in this Agreement, the term "cash" shall mean immediately available United States funds transferred by certified check or wire transfer.

The Deposit shall be applied to the Consideration in the event that the Closing takes place at the time and in the manner provided in this Agreement.  The Deposit shall be paid to Seller in the event that Closing does not occur in accordance with the terms of this Agreement due to the failure of Buyer to comply with its obligations under this Agreement.  The Deposit shall be returned to Buyer (a) in the event that Closing does not occur in accordance with the terms of this Agreement due to the failure of Seller to comply with its obligations under this Agreement, (b) in the event Buyer terminates this Agreement as a result of its due diligence investigation of the Business in accordance with Section 4(a) hereof; (c) in the event any conditions to Closing set forth in Section 4 have not been satisfied or waived by the parties on or before the Outside Closing Date; or (d) to the extent otherwise set forth in this Agreement.

3.      Closing.

(a)      Closing; Closing Date.  The parties shall use their good faith best efforts to cause the recording of the Deed (as defined in Section 3(b) herein below) and the other actions required to consummate closing of the transactions contemplated by this Agreement (such actions being referred to herein as the "Closing") to occur on or before _____, or such later date as may be necessary for obtaining any necessary authorization or approval of the Court in the Case and the expiration of any applicable ten (10) day appeal period, which appeal period may be obviated by a finding of the Court that Buyer is a good faith purchaser and the provisions of 11 U.S.C. §363(m) are applicable, assuming there has been no injunction issued concerning consummation of the transactions that are the subject of such approval order (the "Outside Closing Date") unless the parties otherwise agree.  The date on which the Closing takes place is hereinafter referred to as the "Closing Date".  Closing shall be effective as of the close of business on the Closing Date.

(b)      Seller's Deliveries at Closing.  On the Closing Date, Seller shall deliver to Buyer the following documents:

(i)      An assignment of the Ground Leases transferring Seller's interest in the Land to Buyer, subject to any and all easements, covenants, conditions, restrictions, and other matters of record, duly executed and acknowledged by Seller and in recordable form (the "Deed");

(ii)      A bill of sale (or assignments as appropriate) (the "Bill of Sale") in the form attached as Exhibit 3.b.ii. attached hereto and incorporated herein conveying free, clear and unencumbered title to the Assets from Seller to Buyer;

(iii)      Two (2) original counterparts of an Assignment and Assumption of Contracts agreement duly executed by Seller, pursuant to which Seller shall assign and Buyer

NPCOL1:1710653.1

shall assume the Contracts (the "Assignment of Contracts") in the form attached as Exhibit 3.b.iii. attached hereto and incorporated herein by this reference and the originals, to the extent available, of the Contracts.

        (iv)    Two (2) original counterparts of an Assignment and Assumption of Leases Agreement, duly executed by the Seller, pursuant to which the Seller shall assign and the Buyer shall assume the obligations of the Seller under the Leases (the "Assignment of Leases") in the form attached as Exhibit 3.b.iv. attached hereto and incorporated herein by reference, together with the originals of the Leases;

        (v)    Any affidavits, certificates or other items reasonably required for Buyer to obtain a title insurance policy for its purchase of the real property interests included in the Assets;

        (vi)    Certificates of Title to motor vehicles (if any), duly endorsed for transfer;

        (vii)    Any documents necessary to assign the Intellectual Property to Buyer;

        (viii)    A Certificate of Good Standing from the Secretary of State of South Carolina dated not more than ten (10) days prior to the Closing Date for Seller; and

        (ix)    Such other documents, certificates or instruments reasonably requested by Buyer in order to close the purchase and sale transaction contemplated by this Agreement.

        (c)    <u>Buyer's Deliveries at Closing</u>.  On the Closing Date, Buyer shall deliver to Seller or the Title Agent, the following documents:

        (i)    Two original counterparts of the Assignment of Leases and Assignment of Contracts duly executed by Buyer;

        (ii)    A Certificate of Good Standing from the Secretary of State of _____ dated not more than ten (10) days prior to the Closing Date for Buyer, true copies of Buyer's Articles of Organization, and other organizational documents of Buyer, Certificate of Incumbency, and copies of requisite consents and resolutions of Buyer, as may be reasonably requested by Seller;

        (iii)    Any updates or revisions to Schedule 6(b);

        (iv)    All other documents reasonably requested by Seller in order to close the purchase and sale transaction contemplated by this Agreement; and

        (v)    The Consideration to the Seller, plus or minus any adjustments pursuant to Section 3(f) hereof.

NPCOL1:1710653.1

(d)     <u>Recordation of Deed</u>.  Buyer shall cause the Deed to be recorded in the real estate records of Horry County, South Carolina.

(e)     <u>Fees and Closing Costs</u>.  Seller shall pay any documentary transfer tax. Buyer shall pay recording charges for the Deed, the title insurance premium and any endorsements to the Title Policy.  Buyer and Seller shall each pay their own legal fees and other incidental expenses incurred in connection with the acquisition of the Assets.

(f)     <u>Prorations</u>.  Taxes, utility charges, rents, and all other income and expense items pertaining to the ownership and operation of the Business shall be prorated between  Seller and Buyer as of the Closing Date.

4.     <u>Closing Conditions</u>.  Buyer's obligation to Close the transactions contemplated by this Agreement shall be subject to satisfaction or waiver by Buyer of the following conditions:

(a)     The Assets shall be in compliance with all applicable federal, state, and local health, fire, safety, building, and zoning laws, ordinances, and regulations.

(b)     Seller shall have obtained an Order (the "Sale Order") from the Court authorizing Seller's sale of the Assets to Buyer under this Agreement pursuant to 11 U.S.C. § 363(b)(1), and the Sale Order shall provide that the sale, conveyance, and transfer of the Assets to Buyer is free and clear of all liens, claims, encumbrances and other interests pursuant to 11 U.S.C. § 363(f), except for the Assumed Liabilities and any and all easements, covenants, conditions, restrictions and other matters of record relating to the Land; and the Sale Order shall not be subject to invalidation on appeal.

(c)     Any required consents, approvals, permits and licenses to operate the Business including, without limitation, the entry of orders by the Court under the Code authorizing the transactions contemplated by this Agreement, in a form satisfactory to Buyer.

5.     <u>"AS IS", "WHERE IS" Conditions; Waiver of All Warranties</u>.

**BUYER HAS MADE A THOROUGH AND EXHAUSTIVE INSPECTION, INVESTIGATION, ANALYSIS, TESTING, STUDY, EVALUATION AND EXAMINATION OF THE ASSETS.  ANYTHING UNDER APPLICABLE LAWS OR IN THIS AGREEMENT TO THE CONTRARY NOTWITHSTANDING, THE SALE AND CONVEYANCE OF THE ASSETS PURSUANT HERETO IS MADE ON AN "AS IS", "WHERE IS" BASIS.  BUYER EXPLICITLY AGREES THAT BUYER IS ACQUIRING THE ASSETS IN "AS IS" CONDITION.  NO IMPLIED WARRANTIES AS TO THE CONDITION, SUITABILITY, FITNESS, MERCHANTABILITY, MARKETABILITY, HABITABILITY, GOOD OR FAIR CONDITION OR REPAIR, GOOD WORKMANLIKE CONSTRUCTION, QUALITY OR QUANTITY OF THE ASSETS ARE CREATED OR INTENDED TO BE CREATED BY SELLER OR BY THIS AGREEMENT OR ARE ANTICIPATED, EXPECTED OR RELIED UPON BY BUYER. BUYER EXPLICITLY WAIVES ANY AND ALL RIGHTS UNDER AND RELEASES SELLER FROM ANY AND ALL DUTIES IN CONNECTION WITH ANY WARRANTIES OF WHATSOEVER KIND OR NATURE INCLUDING AS AFOREDESCRIBED, WHICH MAY ARISE INDEPENDENT OF THIS AGREEMENT**

NPCOL1:1710653.1

**AS A MATTER OF LAW. THE ONLY WARRANTIES MADE BY SELLER WITH RESPECT TO THE ASSETS ARE THOSE THAT ARE EXPRESSLY SET FORTH IN THIS AGREEMENT, WHICH WARRANTIES SHALL SURVIVE AND REMAIN IN FORCE AND EFFECT ONLY FOR SO LONG AS IS ELSEWHERE PROVIDED IN THIS AGREEMENT, BUT IN NO EVENT IN EXCESS OF SIX MONTHS. FURTHER, SELLER MAKES NO WARRANTIES AS TO THE ABILITY OF BUYER TO OCCUPY OR OPERATE THE ASSETS, OTHER THAN AS ARE EXPRESSLY SET FORTH IN THIS AGREEMENT. BUYER ACKNOWLEDGES, UNDERSTANDS AND COMPREHENDS THE EFFECT OF THIS PARAGRAPH AND EXPLICITLY AGREES TO THE PROVISIONS OF THIS PARAGRAPH KNOWINGLY AND WITH ADVICE OF LEGAL COUNSEL**.

6.    <u>Due Diligence</u>.

(a)    <u>Buyer's Inspection; Delivery of Due Diligence Information</u>.    In conjunction with this Agreement, Buyer shall execute a Confidentiality Agreement and an Access Agreement with Seller.  To the extent not already delivered to Buyer, Seller shall provide to Buyer such documents and information pertaining to the Assets as Buyer may reasonably request.  Buyer and its employees, agents and consultants will have the right to enter upon the Land at reasonable times to inspect, examine, survey, perform physical and environmental tests, and otherwise do whatever may be necessary or appropriate to verify the accuracy of the information provided to Buyer and to investigate any other matter which Buyer deems appropriate in order to evaluate the economic and operational viability of the Business.  The Due Diligence Period will expire on _____.  Seller shall reasonably cooperate with Buyer in the Buyer's due diligence inspection of the Assets.

(b)    <u>Assumption of Contracts and Leases</u>.  As part of Closing, Buyer acknowledges and agrees to expressly assume all post-Closing obligations of  Seller under the Contracts and Leases, but only to the extent that such Contracts and Leases are listed on Schedule 6(b) attached hereto and incorporated herein by reference, and not disapproved by Buyer prior to Closing.

7.    <u>Representations and Warranties of the Seller</u>.  As an inducement to Buyer to enter into this Agreement, Seller hereby makes the following representations, warranties and covenants, each of which is material to this transaction, and upon all of which Buyer is relying in entering into this Agreement.

(a)    <u>Capacity</u>.    Seller has the requisite right, power, legal capacity, and authority to enter into this Agreement and to fully perform each and all of its obligations under this Agreement.  All of the documents to be executed by Seller which are to be delivered pursuant to the terms of this Agreement will be duly authorized, executed, and delivered by Seller and will be the legal, valid, and binding obligations of Seller enforceable against Seller in accordance with their respective terms, and will not violate any provisions of any agreement to which Seller is a party or to which Seller is subject.  The individuals signing this Agreement and all other documents executed or to be executed pursuant hereto on behalf of Seller are and shall be duly authorized to sign the same on their behalf and to bind them thereto.

NPCOL1:1710653.1

(b)    Contracts; Leases.  Seller has delivered, or will pursuant to Section 6 deliver, to Buyer copies of all Contracts and Leases of Seller of which Seller has knowledge.

(c)    Taxes.  Seller will pay from the Consideration all real and personal property taxes assessed against the Assets or any portion thereof to the extent due and payable prior to the date of this Agreement and the Closing Date.

(d)    Sufficiency of Assets.  The Assets include substantially all of the assets and properties used or employed by the Seller in the Business as presently conducted.

(e)    Warranties.  The representations and warranties in this Section 7 shall be true and correct on the date of this Agreement and on the Closing Date.  The representations and warranties made in this Agreement shall merge into any instrument or conveyance delivered at Closing.

8.    Representation and Warranty of the Buyer.  As an inducement to Seller to enter into this Agreement, Buyer hereby makes the following representation which is material to this transaction, and upon which Seller is relying in entering into this Agreement:

(a)    Capacity.  Buyer has the requisite right, power and legal capacity and authority to enter into this Agreement and to fully perform each of its obligations under this Agreement.  All of the documents to be executed by Buyer which are to be delivered to Seller will be duly authorized, executed and delivered by Buyer, and will be the legal, valid and binding obligations of Buyer enforceable in accordance with their respective terms, and will not violate any provision of any agreement to which Buyer is a party or to which Buyer is subject.

9.    Pre-Closing Covenants.

(a)    Insurance to Remain in Full Force and Effect through Closing.  The insurance policies covering the Assets which are in existence as of the date of this Agreement, or substantially equivalent coverage, shall remain continuously in full force and effect through the Closing Date.  Seller shall deliver evidence of such coverages to Buyer upon Buyer's request therefor.

(b)    Repair, Operation and Maintenance of Assets.  Prior to the Closing, Seller shall operate, manage and maintain the Assets in a manner sufficient to prevent any material diminution of its present condition or value (subject to reasonable wear and tear, and damage from condemnation and casualty) and shall maintain present services and sufficient inventory for the efficient operation and management of the Assets and Business in the same manner and level as the Assets and Business are being operated and managed as of the date hereof.

(c)    Changes in Conditions.  Seller shall promptly notify Buyer of (i) any material change in any condition, event or circumstance with respect to the Assets about which Seller has knowledge, (ii) any event or circumstance which makes any representation or warranty of Seller hereunder materially untrue or misleading about which Seller has knowledge, or (iii) any covenant of Seller hereunder that is incapable of being performed and about which Seller has knowledge.  In the event of a material adverse change in the condition, value or operation of the

8

Assets prior to the Closing Date, Buyer shall have the right to terminate this Agreement and the Deposit shall be returned to Buyer.

(d)     **Termination of Employees; Obligation for Benefits**.  Seller shall terminate the employment of all its employees as of the Closing Date and shall assume full responsibility for all employee compensation and other employment benefits due and owing or accrued, including without limitation, vacation, personal and sick days, as of the Closing Date.  In order to promote an orderly transfer of the Assets, Buyer agrees that it will evaluate in good faith the employment of  Seller's current employees who meet Buyer's standards and subject to the employment terms and conditions established by Buyer in its sole and absolute discretion.  Seller agrees that Buyer may contact such employees prior to Closing to discuss potential employment arrangements.

10.     **Damage and Destruction; Condemnation**.

(a)     **Insured Casualty Costing Less than $100,000 to Repair**.  If, prior to the Closing, there is insured damage to or destruction of any part of the Assets (due to an acute incident only) and the total cost to restore the Assets or repair the damage is less than $100,000, Seller shall, at Seller's election, either (i) repair, restore or replace such damaged Assets in a reasonably good and workmanlike manner to the condition at least as good and useful as that in which it existed prior to such damage or destruction; or (ii) provide all insurance proceeds and other funds required for the repair, restoration or replacement of the damaged Assets to Buyer, in which event Buyer shall make the repairs, restorations and replacements to the Assets.  If, pursuant to the preceding sentence, Seller elects to repair, restore or replace the Assets, but Seller is unable to repair, restore or replace such damage or destruction prior to the Closing, then at Buyer's option: (i) the Closing shall be extended in order to permit Seller to complete such repair, restoration or replacement prior to the extended Closing; or (b) the Closing shall occur on the Closing Date as the same may have been extended pursuant to clause (i) of this Section, and Seller shall deliver to Buyer at the Closing the remaining balance of any insurance proceeds on account of such damage or destruction and other funds required for the repair, restoration or replacement of the damaged Assets.

(b)     **Insured Casualty Costing $100,000 or More to Repair**.  If, prior to the Closing, there is insured damage to or destruction of any part of the Assets (due to an acute incident only) and the total cost to restore the Assets or repair the damage is $100,000 or more, then Buyer may terminate this Agreement upon written notice to Seller within 30 days after the occurrence of such damage or destruction.  Upon the termination of this Agreement, neither party shall have any further rights or obligations under this Agreement (except as otherwise provided in this Agreement), and the Deposit shall be immediately returned to Buyer.  If  Buyer does not timely elect to terminate this Agreement, then Seller may elect either to (i) repair, restore or replace such damaged Assets in a reasonably good and workmanlike manner to the condition at least as good and useful as that in which it existed prior to such damage or destruction and the Closing shall be extended in order to permit Seller to complete such repair, restoration or replacement prior to the Closing; or (ii) the Closing shall occur on the Closing Date as the same may have been extended pursuant to clause (i) of this Section, and Seller shall deliver to Buyer at Closing the remaining balance of any insurance proceeds on account of such

damage and destruction and other funds required for the repair, restoration or replacement of the damaged Assets.

(c)    <u>Uninsured Casualty</u>.  If, prior to Closing, there is uninsured damage to or destruction of any part of the Assets (due to an acute incident only), then Seller may elect to repair, restore or replace such damaged Assets in a reasonably good and workmanlike manner to the condition at least as good and useful as that in which it existed prior to such damage or destruction, or notify Buyer that Seller elects not to repair, restore or replace such damaged Assets.  If Seller elects to repair, restore or replace such damaged Assets, and Seller is unable to repair, restore or replace such damaged Assets prior to the scheduled Closing Date, then the Closing Date shall be extended for such period of time as is reasonably required in order to permit Seller to complete such repair, restoration or replacement.  If Seller notifies Buyer that Seller elects not to repair, restore or replace such damaged Assets, then Buyer shall elect, prior to the earlier of (i) the date which is thirty (30) days after the date Buyer receives Seller's notice, or (ii) the Closing Date, in writing, at its option one of the following: (i) to terminate this Agreement, in which event neither party shall have any rights or obligations under this Agreement, and the Deposit shall be immediately returned to Buyer; or (ii) to proceed with Closing without any offset against, or deduction from, the Consideration.

(d)    <u>Condemnation</u>.  In the event the Assets or any material portion thereof is taken by eminent domain or any condemnation proceedings are commenced prior to the Closing, then Buyer may, within the earlier of thirty (30) days after receipt of notice of the condemnation, or the Closing Date, elect in writing either (i) to proceed with the transaction, in which case Buyer shall receive an assignment of any condemnation award payable to Seller or (ii) to terminate this Agreement upon written notice to Seller, in which case neither party shall have any further rights or obligations under this Agreement the Deposit shall be immediately returned to Buyer.

11.    <u>Miscellaneous</u>.

(a)    <u>Addresses for Notices</u>.    All notices, demands, requests or replies (collectively, the "Notices") provided for or permitted by this Agreement shall be in writing and may be delivered by any one of the following methods: (a) by personal delivery; (b) by deposit with the United States Postal Service as certified or registered mail, return receipt requested, postage prepaid to the addresses stated below; (c) by prepaid deposit with an overnight express delivery service; or (d) by means of electronic facsimile transmission ("fax").  Notice deposited with the United States Postal Service in the manner described above shall be deemed effective three (3) business days after deposit with the Postal Service.  Notice by overnight express delivery service shall be deemed effective one (1) business day after deposit with the express delivery service.  Notice by personal delivery shall be deemed effective at the time of personal delivery.  Notice by fax shall be deemed effective at the time the fax transmission is confirmed to have been received by the recipient.

For purpose of Notices, the address of Seller shall be:

10

INLET RETAIL ASSOCIATES, LLC
c/o _____
_____
_____
_____
_____
Telephone No.: _____
Fax No.: _____

E-mail Address:_____

with a copy to:

Ivan N. Nossokoff, Esquire
Ivan N. Nossokoff, LLC
1470 Tobias Gadson Blvd., Suite 107
Charleston, South Carolina 29407
Telephone: (843) 571-5442
Fax No.: (843) 571-5433
E-mail Address:  inn@nosslaw.com


For purpose of Notices, the address of  Buyer shall be:


_____
_____
Attention: _____
Telephone No.:_____
Fax No.:_____

with a copy to:


_____
_____
_____
_____
_____
_____

  (b) <u>Other Documents</u>.  Seller and Buyer agree that they will, at any time and from time to time after the Closing, upon the request of the other party, execute, acknowledge, and deliver all such further deeds, assignments, transfers, advances, and other documents as may be reasonably required for the consummation of the transaction hereunder.

  (c) <u>Amendment</u>.  No amendment or modification of this Agreement shall be valid unless the amendment or modification is in writing and signed by all parties hereto.

NPCOL1:1710653.1

(d)    <u>Entire Agreement</u>.    This Agreement represents the entire agreement between the parties and incorporates all prior agreements and understandings. No previous agreement or understanding, verbal or written, of the parties or any of their agents shall be binding or enforceable, unless specifically incorporated in this Agreement.

(e)    <u>No Presumption Regarding Drafter</u>.    Seller and Buyer acknowledge and agree that the terms and provisions of this Agreement have been negotiated and discussed between Seller and Buyer, and that this Agreement reflects their mutual agreement regarding the subject matter of this Agreement. Because of the nature of such negotiations and discussions, it would not be appropriate to deem either Seller or Buyer to be the drafter of this Agreement, and therefore no presumption for or against the drafter shall be applicable in interpreting or enforcing this Agreement.

(f)    <u>Time of the Essence</u>.    Time is of the essence of this Agreement. The parties understand that the time for performance of each obligation has been the subject of negotiation by the parties.

(g)    <u>Enforceability of Any Provision</u>.    If any agreement, condition, obligation, covenant, warranty or other provision of this Agreement shall be determined to be unenforceable, invalid, or void, such determination shall not affect, impair, invalidate or render unenforceable any other agreement, condition, obligation, covenant, warranty, or other provision of this Agreement.

(h)    <u>Counterparts</u>.    This Agreement and any amendment may be executed in counterparts, and upon all counterparts being so executed, each counterpart shall be considered as an original and all counterparts shall be considered as one agreement.

(i)    <u>Effect of Titles</u>.    The title of the various articles and sections of this Agreement are solely for the purpose of convenience and shall not be relied upon in construing any provision of this Agreement.

(j)    <u>Brokers' Commissions</u>.    Buyer and Seller warrant and represent to each other that they have not engaged or dealt with any broker, finder, agent or consultant in connection with this Agreement or the transactions contemplated hereby other than CB Richard Ellis ("CBRE"). Seller shall be responsible for any commission owed to CBRE. Buyer and Seller each hereby indemnify and hold the other harmless from and against all liabilities, costs, expenses, and attorneys' fees incurred by the indemnified party in connection with any other claim or demand by a person or entity for any broker's, finder's, or other commission or fee in connection with the indemnifying party's entry into this Agreement and the transactions contemplated hereby.

(k)    <u>Attorneys' Fees</u>.    In the event of a dispute in connection with this Agreement involving the non-performance by a party of its obligations, the prevailing party shall be entitled to reasonable attorneys' fees and all other expenses reasonably incurred in connection with such dispute, whether or not litigation is commenced, in addition to all other relief to which the party is entitled. If the successful party recovers judgment in any legal action or proceeding,

NPCOL1:1710653.1

the attorneys' fees and all other expenses of litigation shall be included in and made part of any such judgment.  As to Seller, see subsection (l) below.

       (l)    <u>Applicable Law; Remedies</u>.  The internal laws of the State of South Carolina shall be applied in interpreting and enforcing this Agreement.  Any and all controversies, claims or disputes arising out of or relating to this Agreement shall be resolved and determined solely and exclusively by and under the jurisdiction of the United States Bankruptcy Court for the District of South Carolina in or in connection with Seller's case, Case No. 09-02083-jw in such Court. The prevailing party to any action or contested matter arising from this Agreement shall be entitled to receive reasonable costs and reasonable attorneys' fees from the non-prevailing party.

       IN WITNESS WHEREOF, the parties have executed this Agreement on the date first written above.

                  "SELLER"

                  INLET RETAIL ASSOCIATES, LLC
                  a South Carolina limited liability company

                  By: _____
                  Printed Name:  _____
                  Title:  _____

                  "BUYER"

                  _____, LLC,
                  a _____ limited liability company

                  By:_____
                  Printed Name:_____
                  Title:_____

NPCOL1:1710653.1

SCHEDULE 1.1

Intellectual Property
**[to be supplied by Seller]**

14

SCHEDULE 1.2

Land
**[as reflected in title commitment]**

NPCOL1:1710653.1

EXHIBIT 2

Escrow Agreement

[To Be Drafted by Buyer's Counsel]

NPCOL1:1710653.1

EXHIBIT 3.b.ii.

Bill of Sale
**[in South Carolina form, as may be drafted by Seller's counsel]**

EXHIBIT 3.b.iii.

Assignment and Assumption of Contracts
**[to be drafted by Seller's counsel]**

NPCOL1:1710653.1

EXHIBIT 3.b.iv.

Assignment and Assumption of Leases
**[to be drafted by Seller's counsel]**

NPCOL1:1710653.1

SCHEDULE 6(b)

List of Contracts and Leases
**[to be supplied by Seller]**

NPCOL1:1710653.1

## ACCESS AGREEMENT

**THIS ACCESS AGREEMENT** (this "Agreement") is made as of _____ __, 2009, by and between **Inlet Retail Associates, LLC DIP,** a _____ ("Owner") and _____ ("Potential Purchaser"), with reference to the following:

A.      Owner owns a certain interests in real property located in Murrell's Inlet, South Carolina, together with the improvements located thereon, commonly known as "Inlet Square Mall" and more specifically described on <u>Exhibit A</u> hereto (such interests in real estate and improvements, together with certain related personal and intangible property, are herein collectively referred to as the "Property").

B.      Owner desires to sell the Property, and Potential Purchaser desires to acquire the Property, and Owner and Potential Purchaser intend to enter into an acquisition agreement in the form of an asset purchase agreement (the "APA") to that effect, though at present no legally binding acquisition agreement exists.

C.      Potential Purchaser has requested access to the Property to commence certain due diligence investigations, and Owner is willing to permit such access for certain specified purposes and on certain restrictive conditions.

**NOW, THEREFORE**, with the intent to be legally bound and for consideration the existence and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Owner agrees to allow Potential Purchaser and Potential Purchaser's engineers, architects and other employees, agents, contractors and consultants reasonable access to the Property for the purposes provided herein.  Potential Purchaser will give Owner or Owner's designee notice by telephone or email prior to each entry into the Property, and Potential Purchaser will not contact the Ground Lessor of the Property or any tenant of the Property directly without Owner's prior written consent.  Potential Purchaser must have Owner's representative accompany it as Potential Purchaser inspects the roof and roof based mechanical equipment of the Property, unless Owner or Owner's representative waives this requirement.

2.      Potential Purchaser and its engineers, architects and other employees, agents, contractors and consultants may exercise such access solely for the purposes of (i) reviewing leases, contracts, books and records relating to Property (other than any privileged, proprietary or confidential records), soil reports, environmental studies and reports, surveys, and building and systems plans; (ii) reviewing records relating to operating expenses; and (iii) inspecting the physical condition of the Property and conducting non-intrusive physical and environmental tests and inspections thereof. Potential Purchaser shall not conduct or allow any physically intrusive testing of, on or

under the property without first obtaining Owner's written consent as to the scope and timing of the work to be performed.

3.    Potential Purchaser agrees that it will cause any person accessing the Property hereunder to be covered by not less than $2,000,000 liability insurance insuring all activity and conduct of such person while exercising such right of access.  Potential Purchaser represents and warrants that it carries not less than $2,000,000 general liability insurance with a contractual liability endorsement which insures its indemnity obligations under this Agreement, including but not limited to its obligations to indemnify Owner and Owner's property manager pursuant to this Agreement.

4.    Potential Purchaser agrees that in the exercise of the right of access granted hereby, it will not interfere in any way with or authorize interference in any way with the quiet enjoyment of all or any portion of the Property or any activity of any tenant thereof, or interfere in any way with or authorize the interference in any way with any person occupying or providing service at the Property.

5.    Potential Purchaser agrees to indemnify, defend and hold Owner free and harmless from any loss, injury, liability, damage, claim, lien, cost or expenses, including reasonable attorneys' fees and costs, arising from the exercise by Potential Purchaser or its employees, consultants, agents or representatives of the right of access under this Agreement or arising out of a breach of this Agreement by Potential Purchaser.  Any inspections undertaken by Potential Purchaser pursuant to this Agreement shall be at Potential Purchaser's sole risk and expense.  This agreement to indemnify and hold harmless shall survive any termination of this Agreement pursuant to its terms.

6.    This Agreement will commence as of its date and automatically terminate upon the earliest of:  (a) written notice from either party to the other that negotiations relating to the APA have been discontinued, or (b) authorization of Owner's sale of the Property pursuant to the APA by the Court in Owner's Chapter 11 bankruptcy case.

7.    This Agreement shall be construed and enforced in accordance with the internal laws of the State of South Carolina.

8.    Nothing contained herein shall in any way imply that Seller is obligated to sell, or Potential Purchaser is obligated to acquire, the Property.

(This space intentionally left blank; signature page follows.)

2

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**OWNER:**

**INLET RETAIL ASSOCIATES, LLC, Debtor-in-Possession**

By:_____
Name: _____
Title: _____


By:_____
Name: _____
Title: _____

**POTENTIAL PURCHASER:**

_____

By:_____
Name: _____
Title: _____